## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

| | | |
|---|---|---|
| **LETA MARIE RIGGS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:10-01425** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### M E M O R A N D U M   O P I N I O N

      This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 40 - 433, 1381-1383f. This case is presently pending before the Court on the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 15 and 19.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 4 and 5.)

      The Plaintiff, Leta Marie Riggs (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on July 17, 2008 (protective filing date), alleging disability as of January 1, 2007, due to back and knee problems, restless leg syndrome, and migraines. (Tr. at 11, 105-07, 108-09, 132.) The claims were denied initially and upon reconsideration. (Tr. at 51-53, 56-58, 66-68, 69-71.) On February 13, 2009, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 72-73.) The hearing was held on May 13, 2010, before the Honorable Joseph T. Scruton. (Tr. at 25-46.) By decision dated July 26, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-20.) The ALJ's decision became the final decision of the Commissioner on

November 9, 2010, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On December 30, 2010, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2010). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity,

2

considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2010). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

(C) *Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C

3

of the Listings of Impairments.

      (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental

---

    [1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, January 1, 2007. (Tr. at 13, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "mild degenerative disc disease of the spine, obesity, anxiety, depressive disorder, restless leg syndrome, and right knee osteoarthritis with recent knee sprain," which were severe impairments. (Tr. at 13, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 14, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity for work at the sedentary level of exertion, as follows:

> [T]he [C]laimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can no more than occasionally climb stairs and ramps and never ladders or scaffolds. She can occasionally stoop but should never kneel, crouch, crawl, or operate foot controls. Due to psychiatric symptoms and with pain not completely relieved by medications as a distracting factor, she can maintain attention and concentration for periods commensurate with tasks containing short, simple instructions and can understand,

> remember and carry out such instructions. She should engage in no more than brief
> and superficial interaction and conversation with the public.

(Tr. at 16, Finding No. 5.) At step four, the ALJ found that Claimant could not return to her past

relevant work. (Tr. at 19, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE")

taken at the administrative hearing, the ALJ also concluded that Claimant could perform jobs such

as a courier/messenger, general office clerk, and hand packer, at the sedentary level of exertion. (Tr.

at 19-20, Finding No. 10.) On this basis, benefits were denied. (Tr. at 20, Finding No. 11.)

<u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying

the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was

defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular
> conclusion. It consists of more than a mere scintilla of evidence but may be
> somewhat less than a preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d

640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the

Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>,

495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by

substantial evidence.

Claimant's Background

Claimant was born on December 1, 1961, and was 48 years old at the time of the administrative hearing, May 13, 2010. (Tr. at 19, 30-31, 105, 108.) Claimant had a limited, or a ninth grade, education, and was able to communicate in English. (Tr. at 19, 131, 137.) In the past, she worked as a fast food restaurant cashier and cook. (Tr. at 19, 30, 35-36, 41, 132-34, 147-51.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will summarize it below in relation to Claimant's arguments.

Physical Impairments:

**_Dr. Rago_**:

On October 24, 2008, Claimant underwent a consultative physical examination with Dr. Andres L. Rago, M.D. (Tr. at 251-58.) Claimant reported chronic pain in her lower back, neck, and knees, resulting from a motor vehicle accident twenty years prior, and restless leg syndrome and headaches. (Tr. at 251-52.) She described the back pain as a constant ache, occasionally severe especially in colder weather, which was aggravated by prolonged sitting, frequent bending, and moderate lifting. (Tr. at 251.) The neck pain was associated with headaches and described as an aching pain. (Id.) The knee pain was aggravated by prolonged standing and weight bearing. (Id.) Claimant reported that her headaches lasted about eight hours and were associated with nausea, vomiting, photophobia, phonophobia, and scotoma. (Tr. at 252.) Headaches were aggravated by going up and down the stairs and staying in a dark, quiet room for some extent. (Id.) She described her restless leg syndrome as recurrent burning or squeezing pain in the lower extremities with twitching of the muscles. (Id.) She also reported involuntary leg jerking primarily at night. (Id.)

On physical exam, Claimant ambulated without any assistive device and with a normal gait pattern. (Tr. at 253.) She was stable at station, but prolonged sitting caused lower back pain. (Id.) She had no difficulty standing from a sitting position, could walk on her heels and toes, and could squat with slight difficulty. (Id.) She had no difficulty getting on and off the exam table. (Id.) She had no limitation of motion in her arms, legs, and neck, and had only slight tenderness at the mid lumbosacral spine. (Tr. at 254.) Claimant had no motor or sensory deficits, muscle weakness or atrophy, and her intellectual functioning and mental status appeared to be normal. (Id.)

### ***Prudich Medical Center***:

Claimant treated at the Prudich Medical Center from October 30, 2008, through December 1, 2008, for checks on her blood pressure. (Tr. at 267-76.) On October 30, 2008, she was diagnosed with hypertension and prescribed Lisinopril 20mg and HCTZ 25mg. (Tr. at 270.) Claimant denied chest pain, shortness of breath, dizziness, blurred vision, slurred speech, or any other neurological deficits. (Id.) She reported that she had smoked one and a half packs of cigarettes for the last 15 to 20 years. (Id.) On November 17, 2008, it was noted that Claimant's blood pressure was improving with medication. (Tr. at 269.) On December 1, 2008, Claimant reported that her blood pressure medication made her feel much better and that she was much improved. (Tr. at 268.)

### ***Dr. Cofer***:

Claimant treated with Dr. Harold A. Cofer, M.D., from March 11, 2009, through August 20, 2009. (Tr. at 301-19.) On her visit on March 11, 2009, Claimant complained of neck and low back discomfort, knee pain, and irregular menstrual cycles. (Tr. at 306.) Respecting her neck, Claimant reported tingling in her arms and a dull, achy discomfort at the base of the neck. (Id.) Regarding her low back, she reported a dull, ache in the small of the back on both sides, which was

aggravated by prolonged standing or sitting and performing domestic activities. (Id.) On exam, Claimant presented with slight inspiratory wheezes and a mildly prolonged expiratory phase. (Tr. at 307.) She had moderate tenderness at the base of the skull and neck on the right side, but had normal range of motion. (Tr. at 308.) Dr. Cofer noted mild thoraco-scoliosis, and noted tenderness over the right paraspinal musculature in the iliolumbar area. (Id.)

Dr. Cofer diagnosed osteoarthritis of the cervical spine, scoliosis of the thoracolumbar spine, hypertension, fibrocystic breast disease, and bladder/uterine descensus. (Tr. at 308.) He ordered x-rays and prescribed Cipro 500mg, Lortab 5mg, Flexeril 5mg, and Nexium 20mg. (Id.)

On April 9, 2009, Claimant denied any weakness, tingling, or numbing of her extremities, and did not have any specific complaints. (Tr. at 304-05.) She rated her cervical and lumbar pain at a level three or four out of ten. (Tr. at 304.) Dr. Cofer noted that she was responding well to the pain management. (Id.) An x-ray of Claimant's lumbosacral spine on April 16, 2009, was unremarkable. (Tr. at 312.) The x-ray of her cervical spine revealed mild degenerative disease with neural foramina narrowing at C3-4 and C4-5 bilaterally. (Tr. at 313.)

On May 7, 2009, Claimant noted a great deal of improvement since starting the medication and rated her pain at a level four out of ten. (Tr. at 302.) She reported that she had become more active with domestic activities and was sleeping better. (Id.) On exam, Dr. Cofer noted that Claimant had a fair range of lumbar spine motion without any significant discomfort. (Id.) He diagnosed osteoarthritis, diffuse and dyslipidemia. (Id.) He referred her to the Charleston bone and joint specialists for a re-check of her back and knee problems. (Id.)

On August 20, 2009, Claimant complained of constant low back discomfort, which was aggravated by extended standing, but not by sitting, and by lifting or pulling. (Tr. at 319.) She

reported that the pain resolved with rest and sitting. (Id.) Claimant rated her pain at a level five out of ten. (Id.) On physical exam, Dr. Cofer noted no gait abnormalities, that she was able to walk on her toes and perform a tandem gait without difficulty, and that her range of lumbar spine motion was adequate with pain at the extremes of extension and flexion. (Id.) Straight leg tests were negative. (Id.) He diagnosed chronic lumbar strain and recreational substance abuse. (Id.) Due to a positive urine drug screen, Dr. Cofer refused to provide any narcotic analgesia. (Id.) Instead, he prescribed Diclofenac 75mg. (Id.)

On January 27, 2010, Dr. Cofer completed a form Medical Assessment of Ability to Do Work Related Activities (Physical). (Tr. at 187-89.) Dr. Cofer opined that Claimant could lift/carry less than ten pounds on an occasional and frequent basis; she could stand and walk less than two hours in an eight-hour day and sit for about two hours; could sit for a total of ten minutes and for five minutes at any given time; that she required a sit/stand option; that she could never climb, balance, stoop, crouch, kneel, or crawl; and that her ability to push and pull was affected by her impairments. (Tr. at 187-88.) Finally, Dr. Cofer opined that Claimant's impairments would cause her to be absent from work more than three times a month. (Tr. at 189.)

### ***Bluefield Regional Medical Center***:

On April 21, 2010, Claimant presented to Bluefield Regional Medical Center with complaints of right knee pain. (Tr. at 355.) She reported that her knee felt like it had popped out of place. (Id.) On exam, Claimant was alert and cooperative; oriented to person, place, and time; and her gait, movement, and sensation were normal. (Id.) She was diagnosed with right knee osteoarthritis, but was stable on discharge. (Tr. at 357.)

***Princeton Community Hospital***:

On May 3, 2010, Claimant presented to Princeton Community Hospital due to high blood sugar. (Tr. at 365-66.) On examination, Claimant's back and neck were normal, and she had full range of motion of the extremities. (Tr. at 366.) Her mood and affect were normal, as was her orientation, sensation, and motor functioning. (Id.) She was diagnosed with poorly controlled diabetes mellitus. (Id.)

Mental Impairments:

***Elizabeth A. Jennings***:

On December 10, 2008, Elizabeth A. Jennings, M.A., a Licensed Psychologist, conducted a psychological evaluation of Claimant, at the request of the West Virginia DHHR. (Tr. at 282-86.) Claimant reported depression, suicidal thoughts, difficulty sleeping, poor appetite, crying spells, low energy level, panic attacks, and a dislike of being around a lot of people. (Tr. at 282.) She explained that her depression had worsened after her parents died in 2006 and 2007. (Id.) On exam, Ms. Jennings noted that Claimant was cooperative and well-groomed; her psychomotor behavior was mildly deficient; she maintained good eye contact; she was oriented in all four spheres; her mood was dysphoric and her affect was labile, at times; her insight, judgment, recent memory, and social functioning were moderately deficient; her immediate memory and concentration was mildly deficient; and her remote memory was within normal limits. (Tr. at 283-84.)

Psychological testing, consisting of the Pain Patient Profile and the Beck Anxiety and Depression Inventory indicated that Claimant had some severe and moderate symptoms. (Tr. at 284-85.) Ms. Jennings diagnosed major depressive disorder, single episode, severe, without psychotic features; panic disorder with agoraphobia; and pain disorder associated with both

psychological factors and a general medical condition. (Tr. at 285.) She assessed a GAF of 55.[2] (Id.) Ms. Jennings noted that Claimant's prognosis was guarded with available medical and mental health treatment. (Id.) Ms. Jennings opined that Claimant's psychiatric symptoms were serious in nature and appeared chronic and that "[a]dditional stress is likely to result in decompensation due to the combination of physical and mental health issues. In her present condition, it is not felt that she would be able to hold gainful employment." (Id.)

Claimant treated with Ms. Jennings from September 17, 2009, through March 17, 2010. (Tr. at 320-23, 335-36.) On September 17, 2009, Ms. Jennings addressed Claimant's grief issues and on October 15, 2009, her depressive and anxiety symptoms, which included her adjusting to her grandchildren's move and her general health problems. (Tr. at 321-22.) On January 20, 2010, Claimant presented with a flat affect and a dysphoric mood, but was normal in all other areas. (Tr. at 336.) Ms. Jennings noted that Claimant continued to struggle with energy and low mood. (Id.) She opined that Claimant's prognosis was fair with available support. (Id.) On March 17, 2010, Claimant's visit consisted of working toward improving her mood and managing her pain. (Tr. at 335.) On mental status exam, Ms. Jennings noted that she had a dysphoric mood and a tired, mildly flat affect. (Id.) Ms. Jennings noted that it was a good session and that Claimant processed her feelings well. (Id.)

On January 5, 2010, Ms. Jennings completed a form Medical Source Statement of Ability to Do Work-Related Activities (Mental), on which she opined that Claimant had extreme

---

[2]  The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has moderate symptoms, or moderate difficulty in social, occupational or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

limitations in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; and complete a normal workday or workweek. (Tr. at 194-96.) She assessed marked limitations in Claimant's ability to remember locations and work-like procedures, sustain an ordinary routine without special supervision, work with or near others without being distracted by them, perform at a consistent pace, respond appropriately to work pressures in a usual work setting, respond appropriately to changes in a routine work setting, and interact appropriately with the public, supervisors, and co-workers. (Tr. at 194-95.) Finally, she opined that Claimant was moderately limited in her ability to make simple work-related decisions and understand, remember, and carry out short, simple instructions. (Id.) Ms. Jennings noted Claimant's report that she had been fired from positions due to absenteeism resulting from depression and anxiety. (Tr. at 196.) Ms. Jennings therefore opined that Claimant's mental impairments would cause her to miss work more than three times a month. (Id.)

### ***Dr. Robertson***:

Claimant treated with Dr. Philip B. Robertson, M.D., from May 7, 2009, through April 28, 2010. (Tr. at 337-46.) On May 7, 2009, Dr. Robertson performed his initial psychiatric diagnostic evaluation. (Tr. at 345-46.) Claimant self reported with complaints of depression resulting from her parents' deaths in 2006 and 2007. (Tr. at 345.) She also reported difficulty sleeping, crying and irritability, a diminished appetite, that she was tense and nervous, episodes of shortness of breath, loss of energy and interests, that she was socially withdrawn except for her family, and frequent suicidal thoughts. (Id.) Dr. Robertson prescribed Xanax .5mg as needed for anxiety. (Tr. at 346.)

Claimant returned to Dr. Robertson on eight occasions between May 27, 2009, and April

13

28, 2010. (Tr. at 337-44.) During these visits, Claimant denied suicidal ideation and was well groomed and cooperative. (<u>Id.</u>) On the last visit, April 28, 2010, Claimant reported that the increased Lexapro was working and that her depression was "so-so even." (Tr. at 337.) At that time, her anxiety had decreased, her thought processes were intact, she had no self perception impairment, and she was oriented fully. (<u>Id.</u>)

On January 14, 2010, Staci Craft, P.A., a physician's assistant, and apparently Dr. Robertson, completed a form Mental Residual Functional Capacity Assessment. (Tr. at 191-92.) They opined that Claimant was markedly limited in her ability to work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (<u>Id.</u>) They further opined that Claimant was moderately limited in her ability to respond appropriately to changes in the work setting, accept instructions and respond appropriately to criticism from supervisors, work in coordination with or proximity to others without being distracted by them, maintain attention and concentration for extended periods, and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (<u>Id.</u>) They noted that it was undetermined as to how many days Claimant would be absent from work due to her mental impairments. (Tr. at 192.)

### *Ms. Jarrell*:

Teresa E. Jarrell, M.A., a Licensed Psychologist, conducted a psychological evaluation of Claimant on April 2, 2010. (Tr. at 324-31.) On mental status exam, Claimant was alert and attentive and was oriented in all spheres. (Tr. at 327.) Her immediate memory was within normal limits, her recent memory was moderately deficient, and her remote memory was mildly deficient. (<u>Id.</u>)

14

Claimant's concentration and insight were mildly deficient and her judgment was moderately deficient. (Id.) She had a satisfactory general fund of knowledge, exhibited a linear and goal-directed thought process, and her thought content was relevant consistently to the questions asked of her. (Id.) Ms. Jarrell diagnosed major depressive disorder, recurrent, severe without psychotic features; generalized anxiety disorder; and pain disorder associated with both psychological factors and a general medical condition. (Tr. at 330.) She assessed a GAF of 55, which was indicative of moderate symptoms. (Id.) Ms. Jarrell opined that Claimant "would not be able to meet expectations of attendance, punctuality, pace and persistence in any work environment." (Id.) She opined that Claimant's prognosis was poor and that she was "likely to be overly reactive to stress, and to decompensate under stress." (Tr. at 331.)

On January 5, 2010, Ms. Jarrell completed a form Medical Source Statement of Ability to Do Work-Related Activities (Mental). (Tr. at 194-96.) Ms. Jarrell opined that Claimant was extremely limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; and complete a normal workday or workweek. (Tr. at 194.) She opined that Claimant was markedly limited in her ability to remember locations and work-like procedures, sustain an ordinary routine without special supervision, work with or near others without being distracted by them, perform at a consistent pace, respond appropriately to work pressures in a usual work setting and to changes in a routine work setting, and interact appropriately with the public, supervisors, and co-workers. (Tr. at 194-95.) Finally, Ms. Jarrell opined that Claimant was moderately limited in her ability to make simple work-related decisions and to understand, remember, and carry out simple instructions. (Id.) She indicated that Claimant's

15

mental impairments would cause her to be absent from work more than three times a month. (Tr. at 196.)

Ms. Jennings completed a further form Medical Assessment of Ability to Do Work-Related Activities (Mental), on May 7, 2010. (Tr. at 333-34.) Ms. Jarrell opined that Claimant had fair ability to follow work rules, relate to co-workers, deal with and use judgment with the public, interact with supervisors, function independently, behave in an emotionally stable manner, relate predictably in social situations, and understand, remember, and carry out simple job instructions. (Id.) She indicated that Claimant had poor or no ability to deal with work stresses, maintain attention and concentration, demonstrate reliability, and understand, remember, and carry out complex and detailed job instructions. (Id.) She had good ability to maintain appearance. (Tr. at 334.) Ms. Jarrell noted that Claimant's "physical health problems and preoccupation with pain will limit her capacity to follow work rules of punctuality and attendance." (Tr. at 333.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to give the appropriate weight to the opinions of Dr. Cofer, Ms. Jennings, Dr. Robertson, and Ms. Jarrell. (Document No. 16 at 4-8.) Citing Maury v. Astrue, 2010 U.S. Dist. Lexis 31386 (N.D. W.Va. 2010), Claimant asserts that the ALJ erred in failing to identify the inconsistencies in the various opinions and the medical evidence. (Id. at 7.) Consequently, Claimant alleges that the ALJ erred in assessing her RFC. (Id.) In response, the Commissioner asserts that the substantial evidence of record as a whole supports the weight given to the opinions and the ALJ's RFC assessment. (Document No. 18 at 12-17.) Consequently, the Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the

ALJ's decision. (Id.)

Analysis.

"RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2010). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2010).

17

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2010). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s) made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge,

18

while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2010). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given),

and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2010). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the

factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

Claimant asserts that the ALJ failed to give any "real analysis of the expert evidence," from Drs. Cofer and Robertson, Ms. Jarrell, and Ms. Jennings. (Document No. 16 at 6.) She notes that the ALJ's only reference to these medical sources "consisted of three paragraphs in which the ALJ recounted their diagnoses and certain observations contained in their reports." (Id.) Regarding her physical impairments, Claimant first asserts that the ALJ mistakenly believed that Dr. Cofer's opinion recognized Claimant's ability to perform work at the sedentary exertional level. (Id. at 7.) Second, she asserts that the ALJ failed to give any examples of the purported inconsistencies between his assessment and his physical findings. (Id.)

In his decision, ALJ Scruton summarized Claimant's treatment with Dr. Cofer and his opinions. (Tr. at 17-18.) The ALJ accorded some weight to Dr. Cofer's assessment to the extent that his opinion recognized Claimant's ability to perform work at the sedentary level of exertion. (Tr. at 18.) However, the ALJ failed to adopt Dr. Cofer's restrictive less than sedentary assessment with zero postural ability as it was "unrealistic in light of the medical evidence of record." (Id.) The ALJ also found that Dr. Cofer's assessment "did not connect his own physical findings with the extreme residual functional capacity assessment." (Id.)

Respecting Claimant's first allegation, it is clear from his opinion that the ALJ did not find that Dr. Cofer's RFC assessment called for work at the sedentary exertional level. (Tr. at 18.) Rather, the ALJ noted that to some extent it allowed for sedentary work, presumably the lifting and carrying of less than ten pounds. (Tr. at 18, 187-88.) However, the ALJ also stated that he did not adopt "Dr. Cofer's restrictive less than sedentary assessment with zero postural ability." (Tr. at 18.) Thus, it is clear that the ALJ was referring to different aspects of Dr. Cofer's opinion when he

mentioned "to the extent that his opinion recognizes the claimant's ability to perform work at the sedentary level of exertion." (Id.)

Regarding Claimant's second allegation, that the ALJ failed to give any examples of the purported inconsistencies between Dr. Cofer's assessment and his physical findings, the Court finds Claimant's argument to be without merit. Though the ALJ did not give specific examples in the paragraph in which he discussed the weight accorded Dr. Cofer's opinion, he summarized Dr. Cofer's treatment of Claimant on the preceding page of his opinion. (Tr. at 17-18.) On that page, ALJ Scruton noted that though Claimant was diagnosed with mild degenerative disc disease, the record contained no diagnostic evidence of any condition more significant. (Tr. at 17, 312-13.) The ALJ also noted that Dr. Cofer's treatment notes indicated a lack of gait abnormalities, adequate lumbar range of motion, and that her right knee osteoarthritis was stable. (Tr. at 17, 302, 304, 308, 319.) Additionally, Dr. Cofer's treatment notes revealed that Claimant responded well to the pain management (Tr. at 304.) and that she was able to perform more domestic activities and slept better. (Tr. at 302.) The ALJ also summarized Dr. Rago's examination notes, which revealed that Claimant had a normal gait and ambulated without assistive devices, was able to stand from a sitting position without difficulty, was able to get on and off the exam table, was able to walk on her heels and toes, and had normal neck and lumbar range of motion. (Tr. at 17, 253-54.)

Accordingly, the Court finds that the weight the ALJ accorded Dr. Cofer's opinion and the ALJ's resulting physical RFC assessment is supported by substantial evidence and that Claimant's challenges on these bases are without merit. The ALJ gave Claimant the benefit of the doubt and limited her to performing sedentary work with restrictive postural limitations. These limitations are supported by the substantial evidence of record.

Regarding Claimant's mental impairments, she first asserts that the ALJ only identified Ms. Jennings and Ms. Jarrell by name and stated that their opinions were inconsistent with their clinical findings, but failed to "correlate functionally with other clinical findings in the record." (Document No. 16 at 7.) She asserts that the ALJ did not mention specifically Dr. Robertson, but referred to his assessment. (Id.) Second, Claimant asserts that the ALJ "cherry-picked the reports and seized upon 'favorable' observations...as if to rebut the experts' conclusions." (Id.)

The ALJ summarized the evidence of record regarding Claimant's mental impairments, and contrary to Claimant's allegation, specifically mentioned Dr. Robertson, Ms. Jennings, and Ms. Jarrell in his opinion. (Tr. at 15, 17-18.) Respecting Ms. Jennings, the ALJ summarized her December 10, 2008, psychological evaluation, the resulting diagnoses and GAF assessment of 55, and her opinion that Claimant was unable to hold gainful employment. (Tr. at 17.) He then summarized her September 17, 2009, psychological evaluation. (Id.) The ALJ noted however, that the opinions that Claimant was unable to work were not supported by Ms. Jennings' treatment notes, which reflected a "mildly dysphoric mood, mildly restricted affect, no suicidal ideations, no delusions or hallucinations, normal speech, normal cognition, and normal thought processes." (Id.) He also acknowledged Ms. Jennings' notes that Claimant's response to treatment was good and that she processed her feelings well. (Id.) Although Claimant asserts that the ALJ "cherry-picked" these factors, Ms. Jennings' additional evidence reveals only moderately deficient insight, judgment, recent memory, and social functioning, as well as mildly deficient concentration and immediate memory. (Tr. at 283-84.) These factors however, are consistent with Ms. Jennings's assessed GAF of 55, which indicated only moderate symptoms.

The ALJ also summarized the April 2, 2010, psychological evaluation by Ms. Jarrell. (Tr.

at 18.) He noted that she, too, concluded that Claimant was unable to hold gainful employment. (Id.) However, the ALJ noted that on mental exam, Claimant had normal speech, alertness, attentiveness, satisfactory effort and completion of tests within typical time frames, orientation in all spheres, normal immediate memory, satisfactory general factual knowledge, and linear and goal-directed thought processes. (Id.) Again, although Claimant asserts that the ALJ "cherry-picked" these factors, the evidence not cited by the ALJ reveals that Claimant had only mildly deficient concentration, insight, and remote memory, and moderately deficient judgment and recent memory. (Tr. at 327.)

Finally, the ALJ summarized the treatment notes from Dr. Robertson, which did not reveal any significant limitations resulting from Claimant's mental impairments. (Tr. at 15, 18.) The Court notes that as of Claimant's last visit with Dr. Robertson on April 28, 2010, her anxiety had decreased, her thought processes were intact, she had no self-perception impairment, and she was fully oriented. (Tr. at 337.)

The ALJ accorded limited weight to the opinions of Ms. Jennings and Ms. Jarrell because their opinions were inconsistent with their own clinical findings and they failed to correlate functionally with other clinical findings in the record. (Tr. at 18.) The Court finds that the ALJ properly explained the bases for his findings and contrary to Claimant's allegation, provided examples of the inconsistencies in the record. The ALJ gave Claimant the benefit of the doubt and crafted an RFC which limited her to performing tasks containing short, simple instructions with brief and superficial interaction and conversation with the public. (Tr. at 16, 18.) Claimant's arguments therefore, are without merit.

After a careful consideration of the evidence of record, the Court finds that the

Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 15.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 18.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to provide copies of this Memorandum Opinion to counsel of record.

.       ENTER: March 30, 2012.

R. Clarke VanDervort
United States Magistrate Judge

25